*1103
 
 IRVING, J.,
 

 for the Court.
 

 ¶ 1. Amanda Schmidt and Brian Bermu-dez are the parents of Colson Bermudez, a minor. Upon a petition by Bermudez, the Marshall County Chancery Court found that a material change in circumstances necessitated that the primary physical custody of Colson be changed from Schmidt to Bermudez. Aggrieved, Schmidt appeals and alleges: (1) that the chancellor erred in maintaining jurisdiction over the case; (2) that the chancellor erred in showing “an extreme bias” toward Schmidt; (3) that the chancellor erred in failing to allow one of Schmidt’s witnesses to testify as an expert; (4) that the court-appointed expert was not properly appointed and that the expert had a conflict of interest that should have prevented his appointment; (5) that the appointed guardian ad litem failed to adequately investigate the case; (6) that the chancellor erred in ordering Schmidt to pay attorney’s fees and other costs due to Schmidt’s contempt; (7) that the chancellor erred in relying on facts that were not in evidence; (8) that the chancellor erred in not ordering a visita-tional schedule for Schmidt; (9) that the chancellor erred in finding a material change in circumstances that necessitated a modification of custody; and (10) that the chancellor erred in finding that Schmidt’s move to Colorado was a material change in circumstances.
 

 ¶2. Finding error, we affirm in part, reverse and render in part, and remanded for further proceedings consistent with this opinion.
 

 FACTS
 

 ¶ 3. Bermudez and Schmidt were married on May 22, 1999, in Memphis, Tennessee. Although they were married in Tennessee, the parties lived in Mississippi during their marriage. On September 4, 2001, Colson was born in Mississippi. On April 5, 2003, Bermudez and Schmidt separated, and on February 4, 2004, Bermu-dez and Schmidt were granted a final divorce by the Marshall County Chancery Court. Pursuant to a divorce settlement agreement, the parties agreed to share custody of Colson, with Schmidt having primary physical custody. The agreement established a schedule for Bermudez’s regular visitation with Colson. Shortly after the grant of divorce from Bermudez, Schmidt married Dr. Jeffrey Schmidt, whom she was apparently seeing prior to the divorce.
 

 ¶ 4. Sometime in 2004, Schmidt noticed bruises on Colson after a visit with Bermu-dez. Concerned, Schmidt took Colson to doctors, and authorities in Tennessee commenced an investigation. Ultimately, the investigation failed to substantiate any abuse by Bermudez. Bermudez continued to have regular visitation, although Schmidt denied him visitation several times.
 

 ¶ 5. On August 25, 2004, Bermudez filed a petition requesting that Schmidt be held in contempt of court and that the divorce decree be modified. In the petition, Ber-mudez stated that Schmidt had told him that she planned to move to Colorado. He also contended that the proposed move to Colorado created a material change in circumstances that warranted modification of custody. Bermudez specifically requested that he either be granted primary physical custody or that his opportunity for visitation be increased.
 

 ¶ 6. On September 2, 2004, Schmidt responded to Bermudez’s petition to modify and requested that the Marshall County Chancery Court relinquish jurisdiction to Shelby County, Tennessee. In her response, Schmidt stated that she and Col-son had lived in Shelby County since May 2003. Schmidt also alleged that Bermudez had moved to Shelby County in October
 
 *1104
 
 2003. Schmidt contended that, prior to Bermudez filing his petition against her, she had filed a petition against him in Shelby County seeking relief because of his alleged abuse of Colson. In reality, Schmidt’s petition was filed a day after Bermudez’s. Schmidt urged the chancellor to contact the Tennessee judge “to determine whether or not this Honorable Court will relinquish jurisdiction to the Court in Shelby County inasmuch as Shelby County is the physical location and residence of not only the child in jeopardy but also both the Petitioner and Respondent.”
 

 ¶ 7. On the same day that Schmidt responded to Bermudez’s petition, the court entered an order refusing to relinquish jurisdiction to the Tennessee court because the Tennessee petition was filed after Ber-mudez’s petition. The court also enjoined Schmidt from taking Colson to Colorado until it gave her permission to do so. In response to the allegations of abuse, the court ordered that Bermudez’s visitation with Colson be supervised.
 

 ¶ 8. On December 6, 2004, the court filed a temporary order appointing Steven Bailey as guardian ad litem and Dr. Wyatt Nichols as a court-appointed psychologist to investigate the case. The court ordered the parties to split Dr. Nichols’s and Bailey’s fees. The court lifted the injunction that prevented Schmidt from taking Col-son to Colorado and established a visitation schedule for Bermudez while Colson was in Colorado. The court ordered Ber-mudez and Schmidt to work together to establish arrival and departure times, and ordered Schmidt to pay for all of Colson’s transportation costs.
 

 ¶ 9. On March 10, 2005, Schmidt filed a petition for temporary relief, informing the court that she was eight weeks pregnant, and that she would not be able to travel due to problems with her pregnancy. Schmidt also stated that she could not afford to continue buying “two to three round-trip airline tickets per month.” Schmidt averred that she had “no income of her own” because, due to her pregnancy, she could no longer work.
 

 ¶ 10. In late March, Bermudez filed an “emergency motion to enforce visitation rights.” Bermudez stated that Schmidt had refused to allow him to fly out to pick up Colson, even though Schmidt was too ill to bring Colson to Mississippi. The guardian ad litem recommended that something be done so that Colson could spend time with his father pursuant to the ordered visitation schedule. On March 28, 2005, the court ordered that Bermudez be given consecutive time for both his March and April visitations periods, and that he be allowed to accompany Colson on the plane rides due to Schmidt’s inability to travel. The court ordered the parties to split evenly the cost of the March/April visitation.
 

 ¶ 11. On June 3, 2005, Bermudez filed a motion for contempt and temporary custody of Colson. In the motion, Bermudez alleged that Schmidt had failed to cooperate with Bermudez to arrange visitation for May and the summer months. Ber-mudez further alleged that Schmidt had refused to pay her half of the costs associated with the March/April visitation. Ber-mudez also complained that, on May 12, 2005, a little more than two weeks after Colson’s return to Colorado, Schmidt took Colson to a psychologist for an investigation into whether Colson had been abused by Bermudez. Consequently, Bermudez alleged that “Respondent’s continual abuse allegations and her subjection of this three (3) year old child to various psychologists is a form of abuse. As such, Movant requests that he be granted temporary custody of the minor child until such time as this matter is finally heard.”
 

 
 *1105
 
 ¶ 12. Evidence at trial showed that Schmidt, based largely on her fears that Bermudez was abusing Colson, had taken Colson to several doctors in Colorado. While in Colorado, Colson’s behavior became increasingly aggressive and erratic, eventually leading to his hospitalization in a psychiatric ward. At the time of trial, Colson was on several psychiatric drugs for treatment of his problems.
 

 ¶ 13. On June 15, 2005, Bailey submitted his initial findings as guardian ad li-tem. In large part, Bailey summarized Dr. Nichols’s findings. Bailey noted that Dr. Nichols’s investigation had revealed that it was “doubtful” that Colson had been abused by his father. Bailey stated that Dr. Nichols found that “Colson’s anxiety around his mother is a reaction to Mrs. Schmidt’s anxiety and the tension and conflict he senses between his parents.” Bailey also noted that Dr. Nichols was able to explain the violent outbursts that Colson sometimes displayed around his mother after visits with Bermudez. Bailey stated that “any aggressive and violent behavior by Colson around his mother is likely a result of having to adjust from an active, stimulating lifestyle at his father’s home, involving frequent play with ‘stimulating toys’ ... to a quieter, more sedate lifestyle with his mother and at daycare.”
 

 ¶ 14. Bailey noted that Dr. Michelle Kelly, a psychologist in Colorado, and Dr. Amy Bebe,
 
 [1]
 
 the first psychologist to see Colson, disagreed with Dr. Nichols’s finding that Colson had not been abused. However, Bailey stated that he was more inclined to trust Dr. Nichols’s findings because:
 

 [he] is the only psychologist to receive input from both Mrs. Schmidt and Mr. Bermudez. Dr. Nichols is the only psychologist to have observed Colson with Mr. Bermudez. Likewise, Dr. Nichols is apparently the only one of the psychiatric professionals involved in this case who reviewed Colson’s pediatric records and who spoke with the social worker who investigated abuse allegations involving Colson, which were deemed to be unfounded. Overall, Dr. Nichols appeared to be more fair and unbiased in his investigation than either Dr. Bebe or Dr. Kelly, prior to rendering an opinion.
 

 Bailey stated that his review of Colson’s pediatric medical records revealed no “serious suspicions of child abuse.... ” Bailey noted that, although Schmidt had told him that she first began to suspect abuse in April 2004, his research indicated that she had raised the issue of potential abuse well before then. Bailey concluded:
 

 I find it difficult to believe that she had forgotten all of the other suspicions of abuse reported to Colson’s pediatrician prior to April 2004. As a parent myself, I feel that I would be able to recall the date, time, and all specific details of any belief that I might have that someone may have abused my child.
 

 ¶ 15. Bailey observed that Colson appeared to be an
 
 “extremely
 
 active child,” such that he might often receive bruises or scrapes, as Bailey asserted is “commonplace in the life of an active three (3) year old boy.” Although Bailey did not outright accuse Schmidt of coaching Colson to say that he had been abused, he noted, “I give little credence to any statements made, by Colson to Dr. Bebe or Dr. Kelly that his father hit him and injured him. I believe that a three (3) year old is very susceptible to coaching, if a parent desired to coach a child.” As to whether Schmidt really believed that Colson had been abused, Bailey stated: “I really can not [sic] say with certainty at this time whether Mrs. Schmidt intentionally manufactured false
 
 *1106
 
 allegations of abuse against Mr. Bermu-dez. Dr. Nichols is convinced that Mrs. Schmidt truly believes that Colson has been abused. Therefore, at this time [,] I will have to give Mrs. Schmidt the benefit of the doubt on that issue.”
 

 ¶ 16. Bailey stated, “I am not prepared at this juncture to recommend to the Court that custody of Colson be awarded to Mr. Bermudez. Mr. Bermudez has never expressed to me that he has serious concerns about Mrs. Schmidt’s parenting abilities, other than her willingness to let him have a relationship with his child.” Bailey recommended that visitations be scheduled every other month, rather than every month, to give Colson time to mature and adjust to “going back and forth between his parents.” Finally, Bailey found that
 

 Colson desperately needs his parents to work together to help him overcome the problems that their divorce and separation have caused for him. Either parent’s unwillingness to participate with the therapist mediator would lead me to believe that the non-participating parent did not have Colson’s best interest at heart and that the non-participating parent should not have custody of Colson.
 

 1117. Dr. Nichols’s findings were in agreement with Bailey’s findings. Dr. Nichols found that “Mr. Bermudez did not express any direct concerns about Ms. Schmidt’s parenting ability. He is concerned that she will continue with what he believes are unfounded allegations to eliminate, or at least significantly limit, his contact with Colson.” Dr. Nichols found that there was nothing to suggest that Colson was “anxious or uncomfortable around his father.” Dr. Nichols did not find that Bermudez had abused Colson, but did find that it was possible that Bermudez had “been too rough with Colson when disciplining him.... ” Dr. Nichols found that there was no reason for Colson’s visits with his father to be supervised.
 

 ¶ 18. On April 4, 2006, after the trial to determine custody, Bailey filed a final report and addendum to his prior findings. Notably, Bailey found that:
 

 the medical records from Colson’s pediatricians show that Mrs. Schmidt has been ‘fishing’ for a child abuse diagnosis for Colson for several years. In addition, Colson’s medical records show that Mrs. Schmidt gave a medical history as late as November 15, 2005[,] in which she claimed that Colson had been physically and sexually abused by his father. There simply is no factual foundation to support the November 2005 history given by Mrs. Schmidt to Colson’s pediatrician.
 

 Bailey found that Schmidt “has perpetrated a form of emotional abuse on Colson by taking the child from doctor to doctor to obtain a child abuse diagnosis in order to assist her in terminating Mr. Bermudez’s rights of visitation with Colson.” Bailey also found that Colson’s condition in Colorado
 

 has been so out of control that he has been hospitalized in a psychiatric hospital and placed on anti-psychotic medication. In addition, Colson must attend weekly therapy sessions in Colorado. Clearly, there has been a change in circumstances since the divorce decree that has adversely affected Colson in a very serious manner.
 

 After examining the factors found in
 
 Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983), Bailey found that it would be in Colson’s best interest for custody to be transferred to Bermudez. In conclusion, Bailey noted: “If custody is granted to Mr. Bermudez, Colson will have both of his parents in his life. If custody remains with Mrs. Schmidt, Colson will likely never have a good relationship with both par
 
 *1107
 
 ents.” Bailey also recommended that the court find Schmidt in contempt because of the numerous problems that Bermudez had encountered when attempting to visit Colson.
 

 ¶ 19. On April 27, 2006, after considering the totality of the circumstances, the court ordered that custody be transferred from Schmidt to Bermudez, and that Schmidt pay child support. The court found that visitation for Schmidt would be “considered upon subsequent petition by Amanda Schmidt for visitation that is supervised by someone from this area who joins in the petition and is accountable to this Court.” Finally, the court held Schmidt in contempt and ordered her to pay Bermudez $2,682.54 for attorney’s fees and for airplane tickets.
 

 ¶ 20. Additional facts, if necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Jurisdiction
 

 ¶ 21. After conferring with the court in Shelby County, it was agreed that Mississippi should retain jurisdiction over the case. Although Schmidt alleges that Bermudez had moved to Tennessee at some point, Bermudez explained that he simply retains a second residence in Tennessee because of his job with the Memphis Police Department. Bermudez testified that he considers Mississippi to be his domicile. On these facts, we find no error with the decision of the chancellor in retaining jurisdiction over this case.
 

 2. Bias
 

 ¶ 22. Schmidt contends that the chancellor’s improper remarks to her and her witnesses demonstrate that the chancellor was unquestionably biased against her. Schmidt avers that, had she known before trial about the chancellor’s bias, she would have filed a motion for recusal. Although we find no reversible error on this point, we agree that the chancellor’s remarks were clearly improper.
 

 ¶ 23. Canon 1 of the Mississippi Code of Judicial Conduct states that a judge “should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved.” Further, Canon 3(B)(4) states: “Judges shall be patient, dignified, and
 
 courteous
 
 to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacities .... ” (emphasis added).
 

 ¶ 24. From the beginning of the trial, the chancellor indicated that he believed that Schmidt and her husband had lied during prior proceedings. During a hearing on Schmidt’s motion to reconsider the court’s decision regarding jurisdiction, the chancellor stated the following:
 

 Well, let me tell you what troubles me. I remember this case and I remember a doctor, he is in this courtroom today. He took the witness stand and denied emphatically under oath that he was having an affair with your client. He is now married to her. That’s perjury. This thing has really got me concerned. And I’m telling you lawyers now, I’m not rendering an opinion today. I’m going to have the court reporter to transcribe some of these hearings, and my main concern is the welfare of this child and the environment this child is in. If this child — if this child is in the home of somebody that takes an oath and perjures themselves that child shouldn’t be there. I’m going to look at it and I’m going to look and see, and if I determine it has been then I’m going to turn it
 

 
 *1108
 
 over to the grand jury. But I’m going to look at this thing, I know what the law is.
 

 [[Image here]]
 

 I’m just concerned — I’m just concerned as to whether or not the people have been playing with this court.
 

 [[Image here]]
 

 Well, I know a doctor that lied to this court, in my opinion, and I’m going to look at it.
 

 However, the chancellor apparently never submitted anything to a grand jury, and the record does not include any transcript of the hearing that the chancellor is referring to. Regardless, the chancellor continued to refer negatively to Schmidt’s alleged perjury, repeatedly telling her that she had already lied to the court before. Bermudez called Schmidt as a hostile witness, and during Schmidt’s cross-examination by Bermudez’s attorney, Schmidt incorrectly stated that she and Dr. Schmidt moved in together in March 2005. After being shown a document by Bermudez’s attorney, Schmidt agreed that it was actually March 2004. The chancellor, however, felt the need to berate Schmidt:
 

 [THE COURT]: You listen to me, I want you to hear me. You committed perjury in this court and your now husband committed perjury in this court. Now, if you commit perjury during in [sic] this trial you are going to leave this courtroom in handcuffs, do you understand me?
 

 [SCHMIDT]: Yes, sir.
 

 [THE COURT]: You’ve lied to this Court before. Now, she just asked you when did you move in with Dr. Schmidt, and you said March of 2005, and she said wasn’t it 2004. Now, let me tell you, your memory is not that bad. So don’t — you wait and you let me finish. Now, don’t you start playing games with this Court, you have lied to this Court for the last time. I’m giving you fair warning. Now, go forward.
 

 ¶ 25. Given that the chancellor had apparently either not had the hearing at issue transcribed or had had it transcribed and found nothing to indicate perjury, the chancellor’s statements to Schmidt were highly inappropriate. When corrected by Bermudez’s attorney, Schmidt did not continue to insist that she moved in with Dr. Schmidt in 2005. The chancellor’s badgering of Schmidt regarding her mistake was improper. Even after Schmidt indicated that she understood the court, the chancellor continued to belittle and threaten her. In short, the chancellor’s conduct was inexcusable.
 

 ¶ 26. Unfortunately, the chancellor’s misconduct was not limited to repeatedly questioning Schmidt’s honesty. The chancellor also continually questioned Schmidt regarding what proof she had to show— even though the court was well aware that Schmidt was being questioned as a hostile witness during Bermudez’s case-in-chief and, therefore, was not yet required to present her case. While Schmidt may have been unfamiliar with when her proof regarding certain items would be offered, the chancellor clearly knew that she had yet to present her case. Regardless, the court continually badgered Schmidt during her cross-examination regarding what evidence she would be presenting. The transcript reveals the following exchange:
 

 [THE COURT]: Do you have any medical proof that’s going to be before the Court today?
 

 [SCHMIDT]: Not today, your Honor. What kind of medical proof?
 

 [THE COURT]: Do you have a pediatrician that is going to testify as to the abuse of your son?
 

 [SCHMIDT]: No, a psychologist.
 

 
 *1109
 
 [THE COURT]: Well, they are a dime a dozen some of them, some of them are good. Do you have a pediatrician?
 

 [SCHMIDT]: No, sir.
 

 [THE COURT]: What evidence do you have?
 

 [SCHMIDT]: Just a few things Colson has said.
 

 [THE COURT]: Well, tell me.
 

 [SCHMIDT]: He — he came out of — you will have to ask one of the witnesses, Ginger, who was in the bedroom with him and she was watching him.
 

 [THE COURT]: Well, tell me — tell me what makes you suspect sexual abuse?
 

 [SCHMIDT]: Well, I don’t suspect necessarily sexual abuse.
 

 [THE COURT]: Well, you said it could — could happen.
 

 [SCHMIDT]: Well, anything could happen, but, you know, he said, I want to get in the bed with you naked like I do with my daddy. He said that to Ginger Giles.
 

 [THE COURT]: I think that you are sick right now, the way you are doing.
 

 [SCHMIDT]: Sir, if you want to ask Mrs. Giles that.
 

 [THE COURT]: Pardon?
 

 [SCHMIDT]: Mrs. Giles is the one that witnessed that, she is the one that told me that.
 

 Rather than wait until Schmidt presented her evidence and witnesses, the chancellor badgered her with questions regarding what evidence she was going to present. When Schmidt told him that she had a psychologist who was going to testify, the chancellor essentially told her that he considered the testimony highly suspect— even though he had not yet heard it. This course of conduct is neither courteous to the witness nor in the best interest of judicial economy.
 

 ¶ 27. Beyond the specific problems that we have already pointed out, the chancellor constantly degraded and belittled Schmidt and her other witnesses:
 

 [THE COURT]: Why didn’t you put the father down in case of emergency?
 

 [SCHMIDT]: It was bad judgment on my part, your Honor.
 

 [THE COURT]: Well, you are going to have to explain it to me better than that. Why didn’t you put the father down?
 

 [SCHMIDT]: Bad judgment. I was afraid to.
 

 [THE COURT]: You what?
 

 [SCHMIDT]: I was afraid to.
 

 [THE COURT]: Why?
 

 [SCHMIDT]: Due to the fact that he had been abusive during the marriage, I was afraid that he — and—and during — before the temporary hearing that we had before the divorce, they had taken the child and had to file a police report because they would not . return the child to me — the grandparents — had to file and had Brian to get off of work before the — when I went to pick him up he wasn’t there, and they refused to bring Colson back and the police said they couldn’t do anything about it because there were no orders, and I was afraid that the same thing was going to happen again. That he would pick up Colson and that I would never see my child again.
 

 [THE COURT]: Do you expect me to believe that?
 

 [SCHMIDT]: Yes, sir.
 

 [THE COURT]: The reason I asked you that, why did you sign an agreement and why did you agree for your husband or ex-husband, he is now, to have joint legal custody in your divorce less than a month earlier, if you
 
 *1110
 
 were worried about that, why did you agree?
 

 [SCHMIDT]: I wanted to get it over with, the divorce. I was ready to stop fighting.
 

 [THE COURT]: Well, I’m going to be honest with you, in reading the file it appears to me that you have schemed every way you can to keep this child away from the father from the very beginning up to this present date.
 

 [SCHMIDT]: No, sir.
 

 [THE COURT]: Well, you are not helping yourself unless you can give me a better answer than what you just gave me.
 

 [SCHMIDT]: There is no — there is nothing else that I can say that— other than it was a bad judgment on my part, I am not trying to keep Colson away from his father. I want him to have a good relationship with his father.
 

 [[Image here]]
 

 [THE COURT]: And then your attorney told you what?
 

 [SCHMIDT]: To take the child to see a child psychologist to let her make that — that expert make that determination.
 

 [THE COURT]: Why a psychologist for a three-year-old child?
 

 [SCHMIDT]: I’m not sure that was just her recommendation.
 

 [THE COURT]: It sounds like she needs a psychologist.
 

 [[Image here]]
 

 [THE COURT]: Forget the Tennessee court. This Court has jurisdiction. Why isn’t the abuse before this court now? The abuse that you alleged in your Tennessee petition, why hadn’t you brought that before this court?
 

 [SCHMIDT]: I have asked my attorney that question, I don’t believe that this court has jurisdiction over this matter because we were all living in Tennessee for a year-and-a-half before this happened.
 

 [THE COURT]: Did you understand what I asked you? I didn’t ask you what you believed. I asked you why you have not brought it before this court. The allegations of abuse?
 

 [SCHMIDT]: On the advice of my attorney.
 

 [THE COURT]: All right. Tell me that to begin.
 

 [[Image here]]
 

 [SCHMIDT]: No, sir. Mostly the bruises and everything has been come [sic] to a halt since we have been in court. The direct words from Brian’s mouth to me was, I know how it hurt you, the bruises—
 

 [THE COURT]: — Well, you know, I didn’t ask you that. You are letting your mouth run away. I wish you would answer the questions I asked you. I’m wanting to know about medical proof. Do you have any? I’m concerned about this child.
 

 [SCHMIDT]: I have — I have—
 

 [THE COURT]: — Because if this child. Just a moment. I’m concerned, because if this man has been abusing this child I will stop him from seeing this child, because this is a baby and this baby is not going to be abused. But if you’ve got fantasies in your head about the abuse you’ve got a problem. And so I’ve got to try and get to the bottom of it.
 

 [[Image here]]
 

 [THE COURT]: Well, just a moment. Just a moment. During that period of time did you deny the visitation?
 

 [SCHMIDT]: I believe I denied some of the visitation.
 

 
 *1111
 
 [THE COURT]: Don’t give me I believe, did you deny it or not deny it?
 

 [SCHMIDT]: I think I did. Yes, sir.
 

 [THE COURT]: Don’t give me things, [sic] “yes or no.” I’m not — I’m not trying to be nasty but you are hedging, did you deny visitation or did you not deny visitation?
 

 [SCHMIDT]: Sir, without looking back I cannot honestly answer that question.
 

 [THE COURT]: Well, you aren’t prepared for this trial then if you have not got that information with you. Go ahead. I will take it that you denied it.
 

 [[Image here]]
 

 [THE COURT]: Just a moment. Just a moment. Let her answer? Mrs. Schmidt, did he have ten days visitation in January of 2005?
 

 [SCHMIDT]: I’m not sure. I’m not sure.
 

 [THE COURT]: Now, you listen to me for a minute. I’ve got to make a decision on the welfare of this child, and when you say “I’m not sure” I’m taking it as no.
 

 [SCHMIDT]: Okay.
 

 [THE COURT]: Now, then, this is 2006, you know. Now, then, you can either testify or not testify. Now, then answer her question if you can.
 

 [[Image here]]
 

 [THE COURT]: No, we are not talking about that. I think the order was specific. The order gave no lead way [sic] to anybody. Now, what is your reason?
 

 [SCHMIDT]: Your Honor, you know this child has been through a-a lot. He has suffered a lot from this. On top of that in my belief that he has continued to be emotionally affected substantially and the fact that my only income is child support, I don’t have the money to fly him to and from three-round trip [sic] tickets every single month for visitation.
 

 [THE COURT]: Did you think about that when you moved to, where is it, Colorado?
 

 [SCHMIDT]: No, sir, I didn’t because I expected to work. And then when we moved shortly thereafter I got pregnant and was very sick with the pregnancy. And now—
 

 [THE COURT]: — Well, did you address the Court, have you petitioned the Court and tell the Court that you was [sic] financially not able to do it?
 

 [SCHMIDT]: I thought we had petitioned the Court that I was not financially not [sic] able to do it. And I thought my attorney did file the petition.
 

 [THE COURT]: The thing that troubles me, is you have been doctor and you have been judge through this whole ordeal.
 

 [SCHMIDT]: I’m sorry, sir.
 

 [THE COURT]: You have been playing the role as judge and doctor. You have been diagnosing the injury, so-called injury to your son, but yet — yet you have no doctors here to testify. You have been interpreting the judge’s orders to your satisfaction.
 

 [SCHMIDT]: Your Honor, I’m doing— I’m doing to the best of my ability to get this child the help that he needs, and the visitation that is with his father that can be afforded.
 

 [THE COURT]: But you are not respecting the Court orders and never have. That’s what is troubling to me. Why?
 

 [SCHMIDT]: I’m very concerned about my son.
 

 
 *1112
 
 [THE COURT]: I’m very concerned about you. I’m going to be honest with you, I really am.
 

 [SCHMIDT]: I’m concerned about his well-being. All of this hostility and all of this—
 

 [THE COURT]: Well, why can’t you follow a Court order?
 

 [SCHMIDT]: I’m scared for him and I am scared for myself.
 

 [THE COURT]: Well, tell me why are you scared for your son?
 

 [SCHMIDT]: I am scared for my son because I am scared that they have not — they have held him longer than supposed to [sic]. They have threatened to keep him. He comes home in — in an emotional wreck and rage where he was hospitalized in the psychiatric unit in the hospital when he was three years old. And this is all very heartwrenching to me.
 

 [THE COURT]: Now, let me tell you something, I’m 66 years of age, I come from a family of seven children. We have a family get — together and it’s about 75 or 80 people there, our family is so large, and you are trying to tell this Court that a three year old has psychological problems and has to go to a psychiatrist?
 

 [SCHMIDT]: Yes, sir.
 

 [THE COURT]: Lady, something is wrong. I have seen something is wrong with you. There is no way a three year old is going to have that [sic] kind of psychological problems with no more than I’ve heard about today. You have — you have brought me no medical, [sic] you have brought me nothing.
 

 [SCHMIDT]: Well, we have—
 

 [THE COURT]: — You have brought me innuendos.
 

 [[Image here]]
 

 [THE COURT]: So why couldn’t you come to the court hearing rather than go to North Carolina, that is some 300 miles closer?
 

 [SCHMIDT]: I was told that it wasn’t going to be a final hearing and that I wasn’t needed to be here.
 

 [THE COURT]: Judge Schmidt again. Go ahead.
 

 [[Image here]]
 

 [THE COURT]: Well, just a moment. Why under God’s green earth did you ever sign that Separation Agreement and that Property Settlement Agreement and that Child Custody Agreement and that Visitation Agreement if all of this was happening? Why?
 

 [SCHMIDT]: Your Honor, I regret that every single day.
 

 [THE COURT]: I didn’t ask you, I asked you why?
 

 [SCHMIDT]: I wanted — I was afraid for my whole life.
 

 [THE COURT]: You wanted out of a marriage to marry your sweetie and get out of dodge, that’s what it boiled down to.
 

 [SCHMIDT]: No, sir, I did not.
 

 [THE COURT]: Well, give me an explanation.
 

 [SCHMIDT]: I was scared for my life from him, from Mr. Bermudez, he had threatened me, he has threatened to kill himself, he has threatened to kill me. He has the — the means and the ways to do it. And I wanted out — out of it for that reason alone. And I was scared, and I was scared but I, in my heart, did not want to believe that he would do the same thing that he had done to me to a child, to a baby.
 

 [THE COURT]: Lady, lady, you get diarrhea of the mouth when I ask you a simple question. Now, then, tell me in simple terms why you signed that
 
 *1113
 
 agreement, knowing that this man had all of those propensities, why did you sign it?
 

 [SCHMIDT]: I just wanted out.
 

 [THE COURT]: So he was that bad, and so you are telling the Court that you were willing to sacrifice the sanity and the safety of your child to this brutal beast to get out of that situation, is that what you are telling the Court?
 

 [[Image here]]
 

 [THE COURT]: How do you know that?
 

 [SCHMIDT]: Because his psychologist in the hospital and the psychiatrist have told me that. When he goes there he can pull it together and hold it together until he comes home and let’s [sic] it all out, because he’s been holding it in for so long.
 

 [THE COURT]: I think you’ve got a psychologist with a yo-yo head.
 

 [[Image here]]
 

 [THE COURT]: Why?
 

 [SCHMIDT]: Because, again, I’m worried about my son.
 

 [THE COURT]: Playing doctor.
 

 [SCHMIDT]: Sir?
 

 [THE COURT]: Playing doctor again.
 

 [SCHMIDT]: I’m listening to his doctors.
 

 [[Image here]]
 

 [THE COURT]: Are you the one that has the problem?
 

 [SCHMIDT]: No, sir.
 

 [THE COURT]: Have you — Well, what type of medication are you on again?
 

 [SCHMIDT]: Antianxiety and antidepressants.
 

 [THE COURT]: You are playing the role very well.
 

 As the preceding excerpts show, the chancellor insulted and badgered Schmidt repeatedly during her cross-examination, before she had even had a chance to present her case. Oftentimes, when Schmidt attempted to give simple answers to questions from the court, such as that she signed her divorce agreement with Bermu-dez because she was afraid, the chancellor rejected her answer and asked her to explain further. Yet, in that particular instance, when Schmidt attempted to explain, the chancellor promptly told her that she had “diarrhea of the mouth.” The chancellor also repeatedly insulted the professionals that Schmidt said she had consulted, saying that one had a “yo-yo head” and that another needed the help of a psychologist. When the chancellor did not berate Schmidt for giving too long of an answer, he often instead sniped at her, saying that she was attempting to function as judge and doctor in the case. During one of these incidents, Schmidt clearly indicated that her attorney had told her that she did not need to be present at a certain hearing, and the chancellor rudely responded, “Judge Schmidt again.”
 

 ¶ 28. Furthermore, when Schmidt’s expert witness, Dr. Kelly, testified, the chancellor threatened to arrest Dr. Kelly when she stated that she had to leave shortly or she would miss her flight back home. The following exchange transpired:
 

 [DR. KELLY]: Okay. Well, I have a flight that leaves at 4:30 from the airport.
 

 [THE COURT]: Yes, ma’am, but you will leave when testimony is through.
 

 [DR. KELLY]: Even though we didn’t start at — I wasn’t the first one this morning?
 

 [THE COURT]: Get me a deputy. Get me a deputy, I’m not going to put up with this. Get me a deputy.
 

 While Dr. Kelly might have erred in questioning the court’s ruling, her questioning
 
 *1114
 
 of the ruling, in light of the fact that she was not allowed to testify earlier in the day, hardly deserved cries from the chancellor for someone to “get me a deputy” so that Dr. Kelly could be arrested. Clearly, the chancellor could have handled the situation in a more mature and professional manner.
 

 ¶ 29. We can find no excuse for the chancellor’s behavior in this case. Repeatedly insulting a witness and the professionals that she has consulted degrades the integrity of the court itself. We can contemplate no circumstances where a chancellor should
 
 ever
 
 tell a witness that she has “diarrhea of the mouth,” regardless of how long or convoluted the witness’s response to a question is. In this case, the chancellor’s thoughtless remarks were compounded by the fact that he was often the cause of Schmidt’s responses as she tried to further explain questions that she had already answered for him.
 

 ¶ 30. Bermudez attempts to explain the chancellor’s actions by stating that “[cjom-ments on the evidence before a juror are treated differently from comments made during a bench trial.” As support, Bermu-dez cites
 
 Moore v. Moore,
 
 558 So.2d 834, 839 (Miss.1990). However, in
 
 Moore,
 
 the chancellor’s remarks were innocuous, especially when viewed in context.
 
 Moore,
 
 558 So.2d at 839-40. While the
 
 Moore
 
 court stated that “the chancellor does not have to express his feelings in a manner pleasing and delightful to the parties’ ears,” we do not interpret this to mean that the chancellor can be as insulting and as crass as he likes. Nothing in
 
 Moore
 
 indicates that a bench trial requires a suspension of the Code of Judicial Conduct’s mandate that the judge act in a courteous manner while presiding over a trial. In fact, the code specifies to which judges the code applies; nowhere are chancellors, presiding over bench trials, excepted from the restrictions.
 

 ¶ 31. While we find that the chancellor’s remarks were clearly inappropriate, we also find that the error arising therefrom was harmless, as the record reveals ample evidence that supports the chancellor’s findings on every issue except that of visitation, which we are remanding for further proceedings. Therefore, we cannot find that the chancellor’s improper conduct affected a substantial right of the parties.
 
 See
 
 M.R.C.P. 61.
 

 3. Designation of Expert Witness
 

 ¶ 32. Schmidt contends that the court erred in refusing to designate her proffered expert witness, Dr. Kelly, as an expert witness. The court reasoned that Dr. Kelly had “only talked with the maternal side in this case.... I’m going to let her testify, but I’m not going to qualify her as an expert.” However, Dr. Kelly then went on to testify as an expert, rather than as a lay witness.
 

 ¶ 33. While we find that the chancellor should have designated Dr. Kelly as an expert witness, any error in failing to do so was completely harmless. Dr. Kelly testified exactly the same as she would have had she been admitted as an expert witness. Therefore, no harm resulted from the court’s decision. This contention of error is without merit.
 

 Jp. Propriety of Court-Appointed Expert
 

 ¶34. Schmidt next contends that Dr. Nichols was improperly appointed because there is nothing in the record to indicate that he was informed of his duties in writing or at a conference that was participated in by all the parties, as is required under Rule 706 of the Mississippi Rules of Evidence. Schmidt contends that
 
 *1115
 
 this omission was crucial because of an alleged conflict of interest that Schmidt contends arose from Dr. Nichols’s interviewing of Bermudez prior to his appoints ment as the court’s expert. We note that Schmidt neither objected to Dr. Nichols being allowed to testify, nor did she demand that his duties be specified in writing or outlined during a conference. Therefore, we find it unnecessary to engage in further discussion concerning the procedural technicalities surrounding the appointment.
 

 ¶ 35. Dr. Nichols testified that although he met with Bermudez, the meeting was not one for treatment or one that would affect his observations in the case. Dr. Nichols ultimately interviewed Colson, Bermudez, and Schmidt. We find nothing in his findings and observations that indicates that he was predisposed toward Ber-mudez or that he had a conflict of interest. In fact, Dr. Nichols’s findings and conclusions with regard to Schmidt were far kinder than Bailey’s or the court’s findings.
 

 ¶ 36. This contention of error is without merit.
 

 5.Guardian Ad Litem’s Investigation
 

 ¶ 37. Schmidt contends that Bailey did not fully investigate the case because he never spoke with her husband. We find no merit to this contention. Bailey’s findings were extensive and well thought out. Bailey stated that he had spoken with everyone he thought might be of value and that he had reviewed numerous documents during his investigation. Bailey also stated that there were people involved whom he did not speak to, because he did not think it would be important to talk to them and that talking to them would simply be a waste of the parties’ resources.
 

 ¶ 38. This assignment of error is without merit.
 

 6. Contempt
 

 ¶ 39. Schmidt argues that the court was in error for finding her in contempt in its final judgment when it had not held a contempt hearing or ever found Schmidt in contempt of court. Regardless of the fact that the court did not find Schmidt in contempt until its final order, we cannot find that the it erred in holding her in contempt. It was clear that Schmidt had failed to allow Bermudez court-ordered visitation on several occasions, and that she had not paid for airline tickets that she was ordered to pay for. In fact, Schmidt admitted that she had denied Bermudez visitation on several occasions. Given Schmidt’s admission, it is unclear to this Court what Schmidt thinks would have occurred differently had the court held a separate hearing. This contention of error is without merit.
 

 7. Facts not in Evidence
 

 ¶40. Schmidt primarily contends that the chancellor assumed “that [she] had made a calculated effort to divorce [Ber-mudez] to marry Dr. Jeffrey Schmidt and then scheme to remove the minor child Colson Bermudez from his father’s life.” Schmidt also complained that the chancellor questioned why Dr. Bebe was not available to testify, since she was only about thirty minutes away from the court. Schmidt claims that the chancellor’s question was disingenuous because he had refused to allow Dr. Bebe to testify at an earlier hearing.
 

 ¶ 41. We note that whether Schmidt divorced Bermudez to marry Dr. Schmidt is largely irrelevant, although it is clear that the chancellor found that such was the case. We note that the evidence adduced at trial indicated that Dr. Schmidt and
 
 *1116
 
 Schmidt were involved prior to Schmidt’s divorce from Bermudez and that Schmidt moved in with Dr. Schmidt very shortly after the divorce was granted. Under these circumstances, the court’s summary of the situation, that Dr. Schmidt had broken up Schmidt and Bermudez’s marriage, is not entirely without merit. Furthermore, there was significant evidence that Schmidt had worked to keep Colson from Bermudez and his family, namely through constant allegations of abuse and the denial of Bermudez’s court-ordered visitation. In fact, Bailey found specifically that Schmidt had worked very hard to keep Colson from interacting with his father, even though Bermudez had never attempted to keep Schmidt from having a relationship with Colson.
 

 ¶42. As for Dr. Bebe’s absence from the proceedings, we cannot find that the court erred in questioning her absence. Dr. Bebe was the first professional to believe that Colson was abused, and her testimony surely would have helped to substantiate Schmidt’s claims of abuse. We cannot find that the court’s refusal to allow Dr. Bebe to testify at the December 2004 hearing somehow precluded Schmidt from calling Dr. Bebe as a witness at the actual trial. Simply because the court was not interested in hearing Dr. Bebe’s testimony in December 2004 does not mean that the court would by necessity be uninterested in hearing the testimony at the actual trial regarding a modification in custody.
 

 ¶ 43. This igsue is also without merit.
 

 8. Visitation
 

 1Í 44. Schmidt contends that the chancellor erred in declining to grant her any visitation rights until she petitioned the court with a third party joined in the petition, for such rights. We agree.
 

 ¶45. Visitation and restrictions placed upon it are within the discretion of the chancery court.
 
 Newsom v. Newsom,
 
 557 So.2d 511, 517 (Miss.1990);
 
 Clark v. Myrick, 523
 
 So.2d 79, 83 (Miss. 1988);
 
 Cheek v. Ricker,
 
 431 So.2d 1139, 1146 (Miss.1983). Where a chancellor has made factual findings on the matter of visitation, this Court will not disturb those findings unless his findings are not supported by substantial credible evidence, he has committed manifest error, or he has applied the erroneous legal standard, (citation omitted). However, while being attentive to the rights of a non-custodial parent, he must keep the best interest of the child as his paramount concern.
 
 Harrington v. Harrington, 648
 
 So.2d 543, 545 (Miss.1994).
 

 Christian v. Wheat,
 
 876 So.2d 341, 345(¶ 13) (Miss.2004). According to the Mississippi Supreme Court, “there must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction. Otherwise, the chancellor’s imposition ... is manifest error and an abuse of discretion.”
 
 Harrington,
 
 648 So.2d at 545. When determining whether visitation is in the child’s best interest, the court must recognize “the need to maintain a healthy, loving relationship between the non-custodial parent and his child.”
 
 Id.
 

 ¶ 46. Here, the chancellor declined to grant Schmidt any visitation with Colson. The chancellor said that visitation would be revisited only when Schmidt petitioned the court, and only if a third party, who would supervise the visitation, joined in the petition. We find that this decision was in error.
 

 ¶ 47. The reports by Bailey and Dr. Nichols indicate that Colson loves his mother very much. Those reports also find that Schmidt’s conduct has placed a strain on Colson and on Colson’s relation
 
 *1117
 
 ship with his father. In its bench opinion, the court stated:
 

 As to visitation the Court is not going to address visitation at this time. I have some grave concerns, you have not followed the Court orders to this date. And I’m not going to give you an opportunity to get this young man in the state of Colorado and not return him. The Court is going to not address visitation at this time. You will need to petition the Court for visitation, and the visitation that I will allow will be supervised visitation with somebody like the Giles family. But they will have to join in your petition for visitation, so that they will be a party to this Court and they will be answerable to this Court, if they will not follow the Court’s directions. You have a lot to prove, Mrs. Schmidt, before you get all of your rights back to your child.
 

 However, we find that the court’s concerns could, and should, have been addressed with less draconian measures. First, the court should not have required a third party to join in Schmidt’s petition for visitation. Merely ordering supervised visitation would be sufficient to address the court’s concern. If the court does not trust someone like the Gileses to adequately supervise the visitation, then the court may appoint someone else to superase visitation. Regardless, there is no need for whoever supervises the visitation to also petition the court. Therefore, we reverse and render the court’s requirement that a third party join in Schmidt’s petition.
 

 ¶48. Furthermore, we remand to the court for further consideration of visitation generally. While Schmidt’s fears and accusations have caused problems for Col-son, we question whether the court’s decision to grant no regular visitation is in Colson’s best interest. Colson loves his mother and has lived with her most of his life. It appears to this Court that “the need to maintain a healthy, loving relationship between the non-custodial parent and his child” would favor regular visitation between Colson and his mother. Restrictions on the visitation, such as where it must take place and whether it is supervised, could be imposed to meet the court’s concerns.
 

 ¶49. On remand, the court must consider what is in Colson’s best interest, taking into account the findings of this Court.
 

 9. Custody
 
 Modification
 
 [2]
 

 ¶ 50. Finally, Schmidt contends that the court erred in finding that a material change in circumstances exists. Schmidt argues that a custodial parent’s move to another state is generally not sufficient to create a material change in circumstances. Schmidt also complains that the court did not specify what it considered to be a material change.
 

 ¶ 51. Modification of child custody is considered only when there has been
 
 “a material change in circumstances which adversely affects the welfare of the
 
 child.... ”
 
 Giannaris v. Giannaris,
 
 960 So .2d 462, 467-68(¶ 10) (Miss.2007) (emphasis added) (quoting
 
 Floyd v. Floyd,
 
 949 So.2d 26, 29(¶ 10) (Miss.2007)). If a material change in circumstances is found, then the court must re-weigh the
 
 Albright
 
 factors to determine whether a modification is in the best interest of the child.
 
 Id.
 
 at 468(¶ 10).
 

 ¶ 52. Generally, “the mere moving of the custodial parent does not consti
 
 *1118
 
 tute a material change in circumstances for child custody modification purposes.”
 
 Id.
 
 at 468(¶ 11) (citations omitted). However, the change in circumstances here was not caused by the “mere moving” of Schmidt. Rather, the change in circumstances was Colson’s severe personality change after the move. While in Colorado, Colson became so violent and wild that he was on several psychiatric drugs just to function as a normal four-year-old child. Schmidt testified that she had been told not to leave Colson alone with his younger half-sister. In Dr. Nichols’s opinion, Col-son’s condition was largely a reaction to Schmidt’s anxious presence. Dr. Nichols' believes that Colson’s psychiatric problems would be greatly alleviated if he were to live with his father. During the trial, Dr. Nichols testified:
 

 And it’s my opinion, and it seems to me that Mrs. Schmidt’s behavior has been extremely consistent, it’s been very logical if you understand how scared she’s been. Think about it, anybody who’s a parent, if you believe your child was being abused every time they spent time with their dad, your child could have been sexually abused — could be sexually abused, definitely being emotionally abused, could be kidnapped, taken away from you illegally, harmed in all of these ways, and you are having to deal with the crap when he came home, because the other person was mistreating him, who wouldn’t have acted kind of similar to the way she did? Not that it’s right, not that it is legal, but her behavior, in my opinion, is very consistent with that perception. It makes a lot of sense to me as a psychologist. It does, based on her feelings the way she’s seeing the world, her anxiety and her depression, then that’s what Colson is having to live with when he’s not with his dad. And he’s having — and I know he’s been diagnosed post-traumatic stress disorder [sic], he’s got some — he’s got the symptoms that would go with that, but those symptoms still go with a lot of — of other problems.... I mean, he — he’s got a lot of symptoms that overlap with a lot of other problems. If there’s a trauma here it’s the idea that Mrs. Schmidt cannot control her feelings and her perceptions in — in what she believes. She’s — she’s acting very consistently and very logically and very rationally based on the way she perceives the situation. And if he is suffering from PTSD I see the trauma as being his mother’s inability to handle the situation, because of her beliefs.
 

 [[Image here]]
 

 I do believe that from everything I’ve heard in the testimony and everything, Colson probably does need to be on medication if he continues to live with his mother. I’m not sure that he needs to be on medicine if he lives with his dad.
 

 [[Image here]]
 

 Now, I am not saying that if you he [sic] were to live with his dad that he could be medication free. I think it would be well worth a try to see how that would go. But my gut just tells me that down the road he might need to be on some medicine, not necessarily this but something of a lesser intensity.
 

 [[Image here]]
 

 I think ... he would be able to be a child and enjoy his — himself and his age if he lived with his dad here. He might be able to live without medicine, I believe he could, but I’m not too sure of that, like I said, I’ve got some concerns maybe something else is going on here. I think life is too stressful for him with his mother, and he’s showing that with his behavior.
 

 
 *1119
 
 ¶ 53. Although the court did not specifically state what it found to be a material change in circumstances, we find that Colson’s psychiatric problems while in the care of his mother represent a material change in circumstances sufficient for the court to look at the
 
 Albright
 
 factors. The court clearly was concerned about Colson’s behavior and the amount of medication that he was on while in Colorado, which together form a material change in circumstances adverse to Colson’s well-being.
 

 ¶ 54. We do not find that the court erred in its
 
 Albright
 
 findings. To summarize, the court found: (1) that employment favored Bermudez, as Schmidt is unemployed; (2) that the health of the parents favored Bermudez because of Schmidt’s mental problems; (8) that moral fitness favored Bermudez because of Schmidt’s adultery during their marriage; (4) that the stability of the home favored Bermudez because of Colson’s severe problems when at his mother’s home; (5) that Bermudez was also favored because of the large extended family that Colson would have in Mississippi; and (6) that Schmidt was disfavored because of her attempts to keep Colson from his father. The court found that all of the remaining factors were inapplicable or favored neither parent. The court did not find that any factor favored Schmidt. We cannot say that the court’s findings were clearly erroneous. Therefore, we do not find that the court erred in transferring custody of Colson to Bermudez.
 

 ¶ 55. This contention of error is also without merit.
 

 ¶ 56. THE JUDGMENT OF THE CHANCERY COURT OF MARSHALL COUNTY IS AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. TWO-THIRDS OF THE COST OF THIS APPEAL ARE ASSESSED TO THE APPELLANT, AND ONE-THIRD OF THE COST OF THIS APPEAL IS ASSESSED TO THE APPELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. CHANDLER, J., CONCURS IN RESULT ONLY.
 

 [1]
 

 . Dr. Bebe’s name is also occasionally spelled as "Beebe” throughout the record.
 

 [2]
 

 . We combine Schmidt’s last two contentions of error into one issue, as the propriety of the court's modification of custody is the true issue addressed by both contentions.